IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER IRBY, | ) | |
| ID # 1443091, | ) | |
| Petitioner, | ) | |
| vs. | ) | No. 3:15-CV-0099-D (BH) |
| | ) | |
| LORIE DAVIS,[1] Director, | ) | Referred to U.S. Magistrate Judge |
| Texas Department of Criminal | ) | |
| Justice, Correctional Institutions Division, | ) | |
| Respondent. | ) | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this habeas case has been referred for findings, conclusions, and recommendation.  Based on the relevant findings and applicable law, the petition for writ of habeas corpus under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

## I.  BACKGROUND

Christopher Irby (Petitioner) challenges his conviction for sexual assault of a child in Cause No. F05-15088-N.  The respondent is Lorie Davis, Director of TDCJ-CID (Respondent).

### A.    Trial and Appeal

On May 2, 2005, the State indicted Petitioner for sexual assault of a child.  (Doc. 13-1 at 5.)[2] He pleaded not guilty and was tried before a jury in the 195th Judicial District Court of Dallas County, Texas, on May 31 – June 7, 2007.  (Doc. 13-1 at 8-9.)

The evidence at trial was summarized by the state appellate court as follows:

---

[1] Lorie Davis succeeded William Stephens as Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Under Rule 25(d) of the Federal Rules of Civil Procedure, she "is automatically substituted as a party."

[2] Page citations refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

W.P. testified that he was sixteen years old in January of 2005.  He worked part-time for his contractor-father, Bobby, after he was expelled from school.  W.P. first met appellant sometime around January 8th, when his friend, James, asked appellant if the boys could do some cleaning work for him.  Appellant agreed and put W.P. and James to work cleaning blinds at a lady's house.  Afterwards, appellant had the boys spend the night in his apartment.  James had appellant buy some "Apple Pucker" alcohol to celebrate James's birthday.  W.P. had never drunk much alcohol before, but he thought it was "cool" to sit around drinking with James and appellant.  W.P. and James got drunk and threw up.  Afterwards, W.P. lay down on a futon, while James stretched out on the floor.  After James fell asleep, appellant put a "hardcore porno" videotape in the TV and came over to W.P. and asked if he could "help" him.  W.P. didn't know what he meant.  But then appellant "kind of pulled the covers off of me and he came down and started to mess with my penis . . ..  He eventually sucked my penis."  W.P. pushed him away, turned over, and went to sleep.

The next morning W.P. did not say anything to appellant because he "was freaked out and [he] didn't know what to do."  He waited around for his money for washing the blinds the day before.  Appellant paid W.P. for the blinds and then gave him some extra money "for what he had done and that [W.P.] should not tell James or anyone."  But that very afternoon W.P. did tell James.  James made W.P. feel bad because he "was talking down on me like that I was gay and like I was wrong and I shouldn't have done it."  W.P. was hurt by James's reaction, so he did not tell anyone else about what had happened.

About three or four weeks later, appellant started calling and asking if W.P. could come over and let appellant watch him masturbate.  At first, W.P. did not want to see appellant, but he later called and asked to borrow some money.  Appellant said that if W.P. "came over there and let him watch [W.P.] masturbate that he would pay [him] some money and [he] wouldn't have to borrow it."  W.P. figured that this was "easy money," so he went over to appellant's apartment.  Appellant gave him oral sex, then paid him $100.  This happened again one or two more times.  The last time it happened—in March or April—appellant said that he would pay W.P. $200, but he only gave him $100.

On April 6th, W.P. told William, a lifelong family friend, what he and appellant had done and how appellant owed him money.  At first, William didn't believe W.P., but when he did, he was "shocked" and angry: "Oh, man, it tore me up," but W.P. told him to "keep his cool whenever he came over" to appellant's apartment.

W.P. spent the night of April 6th at appellant's house, along with William, another friend, Marcus, and Jason Dennis, a friend of Marcus's.  They were all drinking and smoking marijuana.  The four boys left around noon and walked back to W.P.'s house because he was supposed to work for his father that day. After Marcus and his friend left, W.P. and William decided to go back to appellant's apartment to get the

2

$100 that appellant owed him. They told W.P.'s father that appellant owed W.P. money and they were going to go get it. When the two boys did not immediately return, W.P.'s father drove over to appellant's apartment to collect them. Appellant opened the door and told Bobby that W.P. was not there. Bobby then drove back home, and about ten minutes later W.P. and William returned. W.P. seemed "perplexed," and both boys were "agitated." W.P. said that he wanted his money from appellant, so Bobby said that he would drive him over to appellant's apartment to "check on" the money, and then they would go to work.

William, however, had already started back to appellant's apartment to get W.P.'s money. He was angry at appellant. W.P. told his mother that William was going to "jack" appellant for some money. W.P.'s mother told Bobby that William was angry and going to appellant's to collect W.P.'s money, so all three of them drove toward appellant's apartment and found William along the way. William got into the truck with them. Bobby stopped at appellant's apartment complex, saw him in the parking lot, and asked him if he would have W.P.'s money later that day. Appellant said that "more than likely he would," so Bobby said that they would come back later.

Meanwhile, W.P. whispered to his mother, telling her what he and appellant had been doing. As Bobby drove down the street, W.P.'s mother told him that she and W.P. had something to tell him. Bobby pulled into a washateria parking lot, and W.P. told his father exactly why appellant owed him the $100 and why William was angry and ready to "jack" appellant. Bobby called 911 on his cell phone, but the dispatcher told him to come to the police station to make a statement.

Officer Burke, a patrol officer, happened to be driving by the washateria, and he stopped because he saw the family arguing. They were relieved to see him and said that the reason they were upset was because W.P.'s father had just found out that his son had been receiving oral sex from an adult man. W.P. told him that some videotapes in Jason Dennis's car might contain footage of the "sex acts." Officer Burke radioed other officers to go to appellant's apartment while he escorted W.P. and his family to the police station. They met with Debbie Rule, a 20–year veteran with the Balch Springs Police Department, who investigated crimes against children. They all gave written statements.

Finally, the State called Dr. Ellen J. Elliston, a psychologist, who testified that teenagers who experience instability in their lives, such as the death of a family member, may be "more vulnerable to victimization." She also stated that teen-age boys are reluctant to report sexual abuse and usually do not tell their parents about it. Further, their traumatization may affect their ability to provide details or tell a coherent version of events.

Appellant called Cheryl Anderson, a TXU Energy employee, who testified that she had been requested to search the TXU electricity records for appellant's apartment

address between December 1, 2004, and April 7, 2005. Ms. Anderson found no TXU service records for that apartment during that time frame.  She did not know whether electricity had been stopped at that apartment or if it had ever been restored.  She did not know whether TXU had records for electricity to any of the other apartments in that complex or whether other electricity companies provided service.

Appellant also presented an alibi defense for January 8, 2005, from his aunt and uncle.  They both testified that they met with appellant at the uncle's house that evening at about 8:30 p.m. to decide whether to loan him $500 to pay his apartment rent.  Appellant's aunt wrote him a check on that day for his rent, with the notation "Rent, Chris Irby, F1, December 23 through January 31."  She lent him the rent money because appellant was going to go to work for his uncle's company and the repayment would be subtracted from his paycheck.

Phil Blackstone testified that he owned the "four-plex" building in the apartment complex where appellant lived.  Appellant gave him the $500 rent check from appellant's aunt, and he deposited it on January 13, 2005.  Because appellant did not pay the February or March rent, Mr. Blackstone had him evicted on April 14th.

*Irby v. State*, 327 S.W.3d 138, 140-43 (Tex. Crim. App. 2010).

The jury convicted Petitioner, and the trial court sentenced him to life imprisonment.  (Doc. 13-1 at 58.)  The judgment was affirmed on appeal.  *Irby v. State*, No. 05-07-00958-CR, 2008 WL 2469275 (Tex. App. – Dallas 2008).  The Texas Court of Criminal Appeals granted discretionary review and affirmed the judgment of the Court of Appeals.  *Irby v. State*, 327 S.W.3d 138.

## B.     State Habeas Proceedings

Petitioner's state habeas application, signed on November 18, 2011, was received by the state court on November 30, 2011.  (Doc. 14-21 at 8, 19.)  On September 22, 2014, the state habeas court issued findings of fact and conclusions of law.  (*Id*. at 57.)  On November 19, 2014, the state habeas application was denied without written order on the findings of the trial court without a hearing. (Doc. 14-20); *see Ex parte Irby*, WR-81,870-02 (Tex. Crim. App. Nov. 19, 2014).

## C.     Substantive Claims

On December 10, 2014, Petitioner filed a federal habeas petition.  (Doc. 1.)  He raised the

4

following grounds for relief:

> (1) Petitioner's right to confrontation was violated by the requirement that he show a causal connection or logical relationship in order to cross-examine the juvenile complainant about his probationary status; and

> (2) Counsel was ineffective for failing to inform Petitioner in a timely manner about the state's plea offer for 18 years.

Respondent filed a response on April 9, 2015.  (Doc. 15.)

## II.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Because Petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural."  *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established

federal law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  As for the "unreasonable application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; accord *Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000).  Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).  The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## III. CONFRONTATION

Petitioner claims that his Sixth Amendment right of confrontation was violated when he was not allowed to cross-examine the complainant about his probation.

"The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Idaho v. Wright*, 497 U.S. 805, 813 (1990). Criminal defendants receive two valuable protections from the Confrontation Clause-the right to physically face those who testify against them and the right to cross-examine those witnesses. *Coy v. Iowa*, 487 U.S. 1012, 1016-17 (1988). "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405 (1965). "It is axiomatic that defense counsel should be permitted to expose to the jury facts relative to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding." *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

A.    **State Court Proceedings**

Here, defense counsel sought to cross-examine the complainant, W.P., about the fact that he was on deferred-adjudication probation for aggravated assault with a deadly weapon. Counsel argued that the complainant's "vulnerable status" as a probationer showed bias and motive under *Davis v. Alaska*, 415 U.S. 308 (1974). He claimed that when the complainant told his mother and then told the police about the sexual encounters with Petitioner, the complainant thought he might be in trouble because his friend had planned to rob Petitioner. *Irby*, 327 S.W.3d at 153. The trial court did not allow cross-examination of the complainant about his probationary status. *Id.* at 140.

On appeal, the Court of Criminal Appeals expressly rejected Petitioner's argument that a witness's vulnerable relationship with the State through his probationary status is automatically relevant to possible bias or motive to testify:

> *Davis v. Alaska* is not a blunderbuss that decimates all other evidentiary statutes, rules, and relevance requirements in matters of witness impeachment. It is a rapier that targets only a specific mode of impeachment — bias and motive — when the cross-examiner can show a logical connection between the evidence suggesting bias or motive and the witness's testimony. We therefore reject appellant's absolutist position that "[a] probationer, particularly a probationer whose guilt has not yet been adjudicated, is always in a vulnerable relationship with the State" and that mere status is always automatically relevant to show a witness's possible bias and motive to testify favorably for the State as inconsistent with Texas and United States Supreme Court precedent.

*Irby*, 327 S.W.3d at 152.  Rather, Petitioner was required to establish a nexus, causal connection, or logical relationship between the witness's probation and possible bias or motive:

> in the context of cross-examination of a witness with pending charges, "[f]or the evidence to be admissible, the proponent must establish some causal connection or logical relationship between the pending charges and the witness' 'vulnerable relationship' or potential bias or prejudice for the State, or testimony at trial."  That is, a "vulnerable relationship" based on a witness's pending charges or probationary status does not hover cloud-like in the air, ready to rain down as impeachment evidence upon any and all such witnesses.  There must be some logical connection between that "vulnerable relationship" and the witness's potential motive for testifying as he does.

*Id.* at 147-48 (citation omitted).

The Court of Criminal Appeals explained that Petitioner's claim that the complainant told his mother that Petitioner sexually assaulted him because he feared getting into trouble for his friend's plan to rob Petitioner was not a relevant basis for cross-examination about his probation:

> First, W.P. had already told two other people about the sexual encounters, so he did not make up the story at the time he told it to his mother.  Second, W.P.'s act of telling his mother this story is totally unconnected to his later act of telling the police. Third, William had already been deterred from accosting appellant at the time W.P. told his mother this story, so any anticipated "robbery" by William had already been foiled.  Fourth, even if William had succeeded in "robbing" appellant, appellant fails to suggest how William's conduct would be attributable to W.P. or how a false story of W.P.'s consensual sexual encounters would exonerate or ameliorate the conduct of either of them.  Fifth, if W.P. felt that he had a "vulnerable relationship" with law enforcement or the State, the very last thing that he would logically do is invite their scrutiny by filing a criminal complaint against someone else for sexual

8

assault.  That act would make a "vulnerable relationship" much more vulnerable.

*Id*. at 154.  The Court of Criminal Appeals held that Petitioner's confrontation rights were not violated under *Davis* because he did not logically connect the complainant's testimony about his sexual encounters with Petitioner and his probationary status; he did not show a nexus, causal connection, or logical relationship between the complainant's probation and his potential bias to testify favorably for the State.  *Id*.

**B.**      ***Davis v. Alaska***

Petitioner argues that *Davis* holds that cross-examination about a witness's probationary status must be allowed, regardless of whether there is any connection or relationship between the witness's probationary status and his potential bias to testify favorably for the prosecution.

In *Davis*, the Supreme Court held that the Confrontation Clause required that defense counsel be allowed to cross-examine a witness about his juvenile probationary status to show bias and motive despite a state statute that provided for the confidentiality of a juvenile's probationary status. In that case, a safe that was taken in a burglary was found on the witness's property near his family's home.  The witness, who was on probation for burglary, testified that he saw two men near the area where the safe was discovered.  He identified the defendant in a photo lineup as one of the men.  *Id*. at 309-10.  On cross-examination, the witness testified that he was not concerned that the safe was found on his property.  Although it crossed his mind that the police might think he was suspect, he was not worried about that while he was being questioned by the police.  He testified that he had never before been questioned by police officers like that.  *Id*. at 312-13.

The Supreme Court explained that the need to cross-examination of the witness about his probationary status was crucial because his lack of concern about being a suspect in the burglary and

his denial that he had ever been the subject of police interrogation were unchallenged. The witness was on a probation for burglary, so it was likely that he had been interrogated by the police in that case. *Id*. at 313-14. The Court observed that "[i]t would be difficult to conceive of a situation more clearly illustrating the need for cross-examination." *Id*. at 314. It held that "[o]n these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id*. at 318. Accordingly, "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer, *cf. Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), as well as of [the witness's] possible concern that he might be a suspect in the investigation." *Davis*, 415 U.S. at 317-18.

Contrary to Petitioner's argument, *Davis* did not hold that the mere fact that a witness is on probation is always admissible to show bias. The Supreme Court found a constitutional violation because of the relationship between the nature of the additional, particular facts surrounding the witness's probation and his testimony. Justice Stewart's concurring opinion specifically recognized that "the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions." *Davis*, 415 U.S. at 321 (Stewart J. concurring).

Other courts have recognized a nexus requirement similar to the Court of Criminal Appeals. *See Winfield v. O'Brien*, 775 F.3d 1, 11 (1st Cir. 2014) (state court's rejection of Sixth Amendment claim was not unreasonable under § 2254 where the defendant was not allowed to question a witness about pending criminal charges; the witness gave statements before charges were brought against

her, and the habeas petitioner "points to no case holding that the exclusion of evidence having such a logically attenuated ability to imply bias is unreasonable"); *Quinn v. Neal*, 998 F.2d 526, 532 (7th Cir. 1993) (no Sixth Amendment violation in § 2254 case where the defendant was not allowed to question a witness about her fear of losing her children through possible reinstatement of dismissed petitions by a state agency that alleged child abuse, because the defendant did not show a nexus or connection between the petitions and the witness's testimony); *United States v. Mansaw*, 714 F.3d 785, 788-89 (8th Cir. 1983) (discussing the nexus requirement).

The constitutional right of cross-examination is not unlimited. *United States v. Love*, 599 F.2d 107, 108 (5th Cir. 1979). Trial judges retain the discretion to impose reasonable limits on cross-examination consistent with the applicable rules of evidence for questioning that is only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "The trial court has broad discretion in determining how and why bias may be proved and what collateral evidence is material to that purpose. Initially, the proponent of the evidence must show that the cross-examination is relevant." *United States v. Love*, 599 F.2d at 108 (citations omitted).

Here, the Court of Criminal Appeals held that Petitioner was required to show a nexus, causal connection, or logical relationship between the complainant's probation and any bias or motive for testifying. This holding was not contrary to clearly established law as determined by the Supreme Court. Its determination that Petitioner failed to show that the complainant's probationary status was relevant to any bias or motive for his testifying was not unreasonable. Petitioner has not shown that the state court's resolution of this issue was contrary to, or was an unreasonable application of, clearly established federal law as determined by the Supreme Court, and he is not entitled to relief on this ground.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner contends that after the jury returned a guilty verdict, counsel told him that the State had made the 18-year offer about one hour earlier, but he had failed to relay the offer until then.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. art. VI.  The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal.  *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  To successfully state a claim of ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective.  *See Strickland*, 466 U.S. at 696.  The Court may address the prongs in any order.  *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance."  *Strickland*, 466 U.S. at 689.  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  A petitioner must "affirmatively prove prejudice."  *Id.* at 693.  The prejudice component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).  Reviewing courts must consider the totality of the evidence before the finder of fact in

12

assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96.

Counsel has the duty to communicate to the defendant formal favorable plea bargain offers. *Missouri v. Frye*, 132 S.Ct. 1399, 1408 (2012).  To show prejudice from ineffective assistance of counsel where a plea offer has lapsed because of counsel's deficient performance, a defendant must demonstrate a reasonable probability he would have accepted the earlier plea offer, that the plea would have been accepted by the trial court, and that it was a plea to a lesser charge or to a sentence of less prison time.  *Id.* at 1409.

In response to the state habeas corpus petition, counsel submitted an affidavit stating that while the jury was deliberating, the prosecutor offered a plea bargain for an 18-year sentence, and counsel "promptly" told Petitioner about the offer.  (Doc. 14-21 at 61.)  They discussed the offer, but Petitioner was concerned about an 18-year sentence.  (*Id.*)  They learned that a juror was "holding out" and had "stopped deliberating."  (*Id.*)  Counsel was wary about whether the juror would hold out, but Petitioner thought there would be a mistrial, and he asked counsel about the likelihood of a better plea offer in the event of a mistrial.  (*Id.*)  As they were discussing the matter, they were informed that the jury had a verdict.  (*Id.*)

The state habeas court found counsel's affidavit credible.  (*Id.* at 58.)  It found that Petitioner did not show that counsel failed to relay the State's plea offer or that counsel was ineffective. Petitioner has not shown the state court's rejection of this claim was unreasonable.

## V.  EVIDENTIARY HEARING

Upon review of the pleadings and the proceedings held in state court as reflected in the state court records, an evidentiary hearing appears unnecessary.

## VI.  RECOMMENDATION

The petition for habeas corpus relief under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

**SO ORDERED** this 22nd day of December, 2016.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

14